Good. Mr. Millman's going first. Thank you, Your Honor. Very good. Good morning, Your Honors. Good morning. May it please the Court, my name is Ken Millman. I represent Edward and Maureen Fogel in this appeal, and I am requesting that two minutes be reserved for rebuttal. Fine. One of the key cases that your opponent argues goes against you significantly is the Hammersmith case, the fairly recent decision of our Court. Might you address the factors in Hammersmith and tell us how this case is different in terms of how you apply the factors? I'd be happy to address the facts of Hammersmith, Your Honor, and I would respectfully suggest that Hammersmith actually supports the position that I'm taking on behalf of my clients, does not contradict it. In Hammersmith, it's a casualty insurance contract, however, it's not an automobile insurance contract. The question was who is going to provide insurance, actually excess insurance, for an injury that occurred at an airport in Pittsburgh. The first thing that Judge Bailson did in Hammersmith in analyzing the case was he said, when we have a conflict of laws between two states, if there is a true conflict, and nobody disputes that there is a true conflict here, when we have a casualty insurance contract, we're going to look to Section 183 of the Restatement of Conflicts. And what that provision specifically states, Your Honor, is that the validity and rights created thereby of the casualty insurance contract are determined by the local law of the state, which the parties understood to be the principal location of the insured risk during the term of the policy. And I think, Your Honor, cut right to the chase and really hit the crux of the dispute between my client's position and the defense position, as well as the position taken by the magistrate judge in his opinion. In the magistrate judge's opinion, he essentially determined that New Jersey law applied because that was the place of the insured risk for the majority of the term of the contract. And specifically, I'm referring the Court to page 19. I think the Court also referred, or the magistrate, excuse me, also referred to Comment D to 193, which talked about basically what the company had reason to foresee when it, quote, issued the policy, close quote. He did, but I don't think Comment D applies as much in the automobile insurance context as it would in other casualty insurance contexts. Yeah, and it's also clear that the very section 193 itself talks about, quote, during the term of the policy, close quote. So I agree with you. And what's key about during the term of the policy? If you look at the facts of this case, Your Honor, during the term of this policy, not only did my clients move from New Jersey to Pennsylvania, not only did they make a declaration of their intent to be permanent residents of Pennsylvania and not New Jersey, but as soon as they moved, they notified the insurance carrier of exactly what they were doing. They called the insurance carrier. They said, we're coming to Pennsylvania. We're requesting that our policy be rewritten as a Pennsylvania insurance policy. But then could they, could AMICA have written the policy without the vehicle being registered in Pennsylvania? Absolutely, Your Honor. And if Your Honor looks at the law that's cited in the appellant's brief, it's our position that that's a prerequisite to insuring or to having registration issued. Well, they do, but they do in the case when you go to the carrier, when you go to register your vehicle. But in essence, they do make the insurance be issued first. In order to register your vehicle in Pennsylvania, before you can register your vehicle in Pennsylvania, proof of insurance is mandatory. So you can say that they occur simultaneously. That's not exactly correct. Do they occur within a few, can they occur within a few moments of each other? Yes. Do you have any authority that says that an insurance company could provide underinsured motorist protection governed by Pennsylvania law for a vehicle that is not registered in Pennsylvania? Well, the first authority that I would point to would be the policies and provisions issued by AMICA in this case. In this case, the policy provisions, when they're talking about issuing first-party benefits, do not specifically say that it's only for vehicles that are registered in Pennsylvania. They talk about vehicles that are required to be registered in Pennsylvania. In other words, after the Fogles made their move to Pennsylvania, did they have a duty to register their vehicle in Pennsylvania? Absolutely. They had to get it registered eventually, but they didn't have to get it registered right away in order for the insurance to be issued according to AMICA's own policies. And I think it's clear from the Pennsylvania statutory provisions governing this case, and even if you look on the DMV website, when you look on PennDOT's website, they say you need to have proof of insurance in Pennsylvania before we'll register your vehicle. Can I just ask one preliminary question? Yes, sir. I believe I should have asked at the outset. It struck me as very interesting that there was this April 9, 2009 letter written by the company, I guess, to you or your client saying which law do you want to apply, New Jersey or Pennsylvania, and you chose Pennsylvania. Is that correct? Yes, sir. And the reason was, was that because Pennsylvania's law gives a benefit with regard to the payment of medical expenses over New Jersey law or what? Well, there's two reasons. Stacking? The first is stacking. I'm sorry. In April 9, 2009, what law did you choose at that time? The way it was presented to us, we could choose either Pennsylvania or New Jersey law. It was conditional, though. If we chose Pennsylvania law, we had to give approximately $175,000 credit, a credit for the amount of medical expenses paid. And that doesn't make sense under Pennsylvania law. Because they weren't payable under Pennsylvania law. Correct. Correct. So you chose New Jersey. But lawful under New Jersey law. Correct. But the law that's at issue here, and there's nothing contradictory about the payment of the medical benefits under Pennsylvania law. Under Pennsylvania law, you can have up to $1.1 million of medical benefits purchased if you purchase excess extraordinary benefits for medical coverage. But in New Jersey, you cannot have stacking at all. It's explicitly barred. It's prohibited. And in addition, New Jersey is a gap rather than an excess state. So essentially what AMICA was asking us to do was forfeit what we believed to be we were entitled to, the full $600,000 benefits of underinsured motorist coverage. So that's why that was rejected, Judge Ambrose. But then at the same time, though, that you took the benefit under New Jersey law of the $175,000 in medical expense coverage. Well, I don't know that we took the benefit, Your Honor. The benefit had already been paid. But you chose at that point New Jersey law, did you not? I don't think we did, Your Honor. Because New Jersey was … What did you write back and say? What we wrote back and said is we would take Pennsylvania law if the credit was not issued. And if the credit were issued? If the credit were issued, no, we're going to take the case to court and allow the courts to decide because we feel strongly that under a conflicts of laws analysis, Pennsylvania rather than New Jersey law applied in this case to the uninsured and underinsured motorist benefits that should have been paid in this case. Okay. You know what the argument is going to be against you, that you want your cake and eat it too. I understand that.  I don't think we're asking for having our cake and eating it too. The FOGOs were never given a chance to purchase, to make these selections to purchase automobile insurance in Pennsylvania because Amica said, no, we're not going to give it to you yet. Well, I mean, they said as soon as you get your license, your registration and your license changed, it will be done ASAP, right, in August of 2008. They said that before you could get a Pennsylvania policy written, you need a license and registration in PIS. And that's standard procedure. But it's not standard if you look at the rules and regulations that PennDOT has as far as getting a motor vehicle registered in the state where you must show proof of insurance before registering the vehicle. But in August of 2008, Mr. FOGO could have gone and done that. I can't dispute that. I can't dispute that. He did what we all do. We procrastinate. He procrastinated, yes, sir. But in essence, he didn't do anything that isn't foreseeable. I mean, there's cases where, you know, I cited the Parker case in my brief. I cited the Davis case in my brief, which was a Third Circuit case. And, you know, if you look at some New Jersey case law, McVicker, that's another case where you have people coming to Pennsylvania, not necessarily performing all the functions necessary to get their cars registered in Pennsylvania, but they're still given the benefit of Pennsylvania underinsured motorist coverage because of the favorability that this state uses when it calls it. I'm sorry. I mean, the problem with McVicker, by the way, is we can't use New Jersey's choice of law here. If we could, that would probably point you to Pennsylvania, wouldn't it? Well, the ironic twist of the whole thing, Your Honor, is that when we moved to remove the case from the state court, Amica filed suit initially. We removed the case to federal court, and then the district judge in federal court, transferred the case over to Pennsylvania, I'd respectfully suggest that, you know, one of the reasons that sua sponte transfer occurred is because they're thinking, well, you know, everybody's in Pennsylvania now. Pennsylvania law is going to apply to this case. The medical benefits that your client received under New Jersey law, was that by reason of the policy that they had? They were paid under the policy, but they were also paid before any claim for uninsured or uninsured motorist benefits was paid. So, yes. But doesn't it place you in a funny situation, though, where you're saying one part of the policy, we look to New Jersey law, and the other part of the policy, we look to Pennsylvania? But if they had Pennsylvania law applying, Your Honor, which they never had the chance to. Well, that's a different matter. Okay. I'll try to answer Your Honor's question as directly as possible. Under Pennsylvania law, they would be given the option to have the same amount of medical benefits payable, which they were never given the choice to make. So that's the position that we're taking, is that, you know, did they have benefits paid under New Jersey policy? They had benefits paid under the policy. The payment of those benefits did not violate Pennsylvania public policy. What we argue violates Pennsylvania public policy is the fact that they're not allowing stacking and that they're choosing to ensure this as a gap UIM policy rather than an excess policy.  Your Honor, our case is different from Caputo, which I believe is a case where a father gives a motor vehicle to his son-in-law and daughter and son-in-law, to his children. Right. They move to PA. Right. And the car itself stays titled in dad's name. The car itself, the dad lives still in New Jersey. And the fact of the case and the way I view it is it's more of a permissive use case. In other words, the dad is saying, I'm permissively allowing you, my son or my daughter-in-law, to use this vehicle, and you can use it wherever you want, but I'm keeping the insurance here, I'm keeping the title here in Pennsylvania, and it's not really, it's not the same facts as this case, so I'd argue that it's factually distinguishable, Your Honor. It's not even the same type of law. It's a permissive use case. Yeah. He's permissively allowing them to use the car in Pennsylvania. That doesn't necessarily, allegedly, yeah. Yeah. I mean, I guess that's a fact. I didn't mean to be rude. I understand. What I was trying to indicate is that the car was here permanently in Pennsylvania. The fact that the car was in Pennsylvania was not enough to convince the Pennsylvania Superior Court that Pennsylvania law should apply. But the owner of the car was still in Jersey, and the title of the car was still in Jersey, and the insurance was still in Jersey. Mr. Millman, thank you very much. Thank you for your time, Your Honors. Mr. Pomeroy. Thank you. I think maybe I can bring out my argument by responding to some of the questions you asked. Do you want to just state your name for the record? Daniel Pomeroy. I'm Whartonson and Pomeroy for Amica Mutual Insurance Company. Can I ask something also, a couple things at the outset? One, the April 9, 2009 letter, what was the reason for giving that option at that time, the choice of Pennsylvania or New Jersey law? Well, actually, to give them the option. I mean, it's by giving them the option. In other words, you weren't sure whether it should be Pennsylvania or New Jersey, or you wanted to give them the option. What was the reason that you were giving them the option, I guess? To try and resolve a case for a family that was involved in a very tragic accident early on. I mean, that's the bottom line on the reason. And actually, by offering New Jersey law at that point, and by, from the outset of this case, taking the position that New Jersey law applied, Amica, by many, many thousands of dollars, increased its exposure. Pursuant to NJSA 39-6A-4, and this, I think, was a question, Judge Sirica, of yours, the reason there's $250,000 worth of PIP benefits, not per accident, but per each individual in New Jersey per accident, is a function of that statute. So it's New Jersey law that governs that question, not the policy. The policy, of course, has to remain in keeping with what the statute says. Otherwise, the policy would be void. But it's New Jersey law that requires that, and it is the Fogles who availed themselves in that regard of New Jersey law. I mean, I don't know how that works. Is Pennsylvania law on the individual $250,000 PIP benefits the same or different? It's optional coverage that you can purchase under Pennsylvania law. Okay. But with regard, Judge Ambrose, to your question on Hammersmith, I think, as I recall, you were on that panel of that decision among the decisions we have here, Compute O and DKM. I mean, the big difference in Hammersmith, as I see it, is that DKM and its broker Aon were in New York when the contract was negotiated, the excess policy contract, and they remained in New York at all times, continuing through to today. And this case is very different because the insureds moved to Pennsylvania, notified the insurer that they had done so. Indeed, the insurer began to send notices, payment notices, to Pottsville. Well, they did indeed, but they also did one critical different fact that didn't happen in the Hammersmith case, and that was simply by Mr. Fogles' own words. If they told me once, they told me twice. No, he agrees. Or they told me a million times. They said, look. Ain't no doubt about it. He agrees they told him. Yeah, and I, you know. But the point is, is that form over substance? In effect here, when you're talking about the restatement 193, which in Hammersmith the court said was not applicable, but here when you talk about an automobile liability policy, it says that 193 does become applicable, and you look at what was the principal location of the insured risk during the term of the policy. Agreed. The first nine months were New Jersey. But after August of 2008, it was expected, anticipated, understood that during the remaining term of the policy, it was going to be Pennsylvania. And obviously AMICA knew that. They agreed with that. It happens every day. That would seem to be the thing that distinguishes this case, another thing that distinguishes this case from Hammersmith, in a very significant way. Well, I think I would point the court to Judge Carlson's, I think, insightful footnote, page 13, I think footnote number 8, in his decision. And that reads, with regard to the common section of 193, where the risk to be insured against will be in a particular state for the majority of the term of insurance, and I'm quoting from the comment, then, Judge Carlson, the risk's principal location is the most important contact to be considered in the choice of applicable law. So when you're talking about a term of law. It also says in comment B that the significance of the state of the risk's length of time that it can be anticipated that chattel will be in other states. And by August of 08, everyone knew that unless something changed drastically, there was going to be Pennsylvania only involved with respect to the location of the principal risk. That's true. But you also had Ms. Galateri of AMICA having the conversations with Mr. That's about procuring new insurance, but the issue here is what law applies for purposes of underinsured motorist coverage. I think it is relevant for this reason, Your Honor. 193 comment B, which, and this is alluded to in the Hammersmith case, indicates that the thing that 193 is trying to center upon is the party's understanding of what law is going to apply to the risk. I mean, that's in Hammersmith and that's in the comment. And if you look at the conversations that they had, I don't think there's anyone at DKM who ever thought that it would be other than New York law because they were buying this. This could happen anywhere in the country. It happened that this accident happened at the Pittsburgh airport. In this case, the insureds and everyone knew that it was in Pennsylvania and that it was more likely than not to be Pennsylvania if there were to be any accident. Yeah, but how could he, how could Mr. Fogle fairly understand that Pennsylvania law would apply to his policy, his New Jersey personal auto policy that he has in front of him when he's been instructed on numerous occasions Judge Ambrose, look, there's something real easy you got to do. It's pretty seamless to change this to a Pennsylvania policy and this is this but, but, but that, those two preconditions don't necessarily change section 193 statement. It is what the parties understood was to be the principal location of the insured risk during the term of the policy in this case after August of 08. So it's a different standard. What you're saying is they put preconditions on it and their logical preconditions. I'm not arguing with you on that. It's just that everyone did understand it. So for example, the Fogles did not call Amica as representative and did not say anything. Hey, we've moved to Pottsville. Then you've, you've got a probably a slam dunk if not a layup, but that's not what happened. That's not what happened here. I think that makes, that would make my position a weaker case. That's why I think our case is stronger than Caputo because uh, in Caputo, if you didn't know that the, that the insured risk had changed states, then I think you would be stronger. Wouldn't you? Well, I think, um, let, let, let's look at the Caputo case in Caputo, which is, it might not be on all fours, but it's on probably three and a half. Uh, the, uh, the law is found to be the F4 insurance jurisdiction and not, uh, Pennsylvania. Uh, if you add to the Caputo fact pattern, Caputo, as I recall, that the, uh, the insurance company was not notified of the change. That to me would be a significant difference. Well, I, but here they were notified of the change and they gave, uh, reasonable instructions on what to do to change the policy and to get first party benefits, uh, in line with a case that is, uh, cited in the materials, I think, uh, your honor. And this, um, judge Vinasky, I think was in response to your question of council, uh, pew versus, uh, Geico. Uh, we've held that an insurance benefits is dependent upon whether the vehicle is registered in Pennsylvania. And I think the response that I heard at least was, uh, that's no, not so, uh, this case goes on to construe the relevant, uh, uh, provisions of this common. But I don't see anything in the commentary of one 93, which specifically does talk about automobile liability, automobile liability policies that says that, uh, it's all pegged on when the actual changeover takes place in terms of the policy switching from one state to another, that that's the easy case. We we've got the one that that's more, more muddled. We've got parties changing states, alerting the insurance company that they have changed states. The insurance company begins to send bills to the new state. And the two things that would formally complete the loop haven't been done yet. That is registration and changing of license. Correct. And, and, and, and, uh, with, uh, fair and ample notice, uh, to the insured, that those things need to be done. But the section, but the section one 93 talk about a formal closing of the loop that needs to be done. I don't, it doesn't, it just merely talks about the, but the, what the parties understood to be the principal location of the insured risk during the term of the policy. Yeah. And I guess what I'm saying is the, uh, understanding could be only one thing against the backdrop of the repeated conversations that were taking place, that the, uh, the risk would remain a New Jersey risk. Until simple steps were undertaken to change it to a Pennsylvania risk. Is that form over substance? I really don't think it is. I think it's, uh, it is by far and away substance over form. It's a, it's critical. What's, what's, what's substantive about it? Uh, instructions, uh, in line with a Pennsylvania law that requires certain things to be done. But back to my question before in connection with section one 93 of the restatement, which does apply to this, what is substantive about the, the note, uh, the administrative tasks of changing registration and changing your license. It's a critical step that needs to be taken to get first party benefits under Pennsylvania law. If that was the case, then why in April of 2009, did you offer the option of choosing Pennsylvania law? Uh, we're trying to, uh, resolve a, a, a conflict situation. I mean, and I'm not knocking it. I appreciate what the company did there, but I mean, but it, it sounds like the company, you could have gone either way at that point in time. Well, again, I, you judge, I, I really don't have an answer, uh, to that other than, um, a daughter has been killed in an auto accident. Two other daughters have been injured. A father has also been injured. And, uh, Amika wanted to try and resolve things and get them, uh, a package of insurance benefits, not under a, uh, have your cake and eat it too. Take one from column A, New Jersey, and one from column B, Pennsylvania, but to choose a package of benefits from either state. And, and let the, uh, the Fogles do that as a means of resolving the case. If they had chosen Pennsylvania law, how would they have been, received less than what they currently have received? I'm sorry, Greg. If the Fogles had in April of 2009 chosen Pennsylvania law to apply, how today would they have received less than they, uh, heretofore have received? Well, I think the point there is when the, uh, PIP exposure was open, um, it didn't turn out to be a 750, uh, or a million dollar exposure. It was about 170. But they opened it in good faith knowing that with, uh, the, uh, injuries and death that occurred, uh, in the accident, they were opening themselves up to a million dollar medical expenses. Why, if the Fogles had chosen Pennsylvania law, would they have been entitled, would AMICA have been entitled to a $175,000 credit, $170,000 credit? Uh, our, our view is the, uh, default medical benefit available without a choice is, uh, $5,000. Does the, um, does the fact that the, uh, uh, uh, what, let me put it this way. Even though the, the registration was never affected, uh, uh, and there's the fact that your company was sending out bills, uh, even before that time, and anticipated that it would be done, presently, uh, does this impact at all on Pennsylvania's public policy interest in, in this analysis? Or is it? They were sending, were you finished, Judge? Yes. Uh, they were sending out bills for premium rated completely and totally in conformance with New Jersey law, New Jersey risks, and among other things, $300,000 of UAM insurance, not $600,000 of UAM insurance, and there is no dispute on that. Those premiums that were sent to that location, which had to be sent to that location because they simply wouldn't get there, uh, were premiums that were rated in conformance with New Jersey law, in conformance with, uh, 1728 1.1c, which prohibits stacking, and which has prohibited stacking since,  1983, which is a, a strong New Jersey, uh, public policy, and which, uh, like the court's pronouncement in Hammersmith, uh, uh, an insurance company where, uh, a policy such as this is underwritten, has a regulatory right to govern the policy, to govern the way, uh, premiums are charged, to, uh, govern the way in which, uh, uh, cases are evaluated by the claims department, and, uh, reserves are, uh, placed on them, and, uh, this policy was written in conformance with a very complex regulatory process that we have in, uh, New Jersey with regard to the, the issuance of personal automobile insurance policies. And like in Hammersmith, uh, New Jersey, in this case, I would submit, has a right to enforce that regulatory process. And like in Hammersmith, uh, it, it trumps, if you will, Pennsylvania's right, uh, to, uh, uh, deal with, uh, innocent accident victims and give insurance benefits in conformance with Pennsylvania law when the policy wasn't written there. That's right, right from the Hammersmith case. Any other questions? Yeah, go ahead. If, if we were to determine that Pennsylvania law applies here, would your company then be entitled to this $170,000 credit? I, I, I believe so, yeah. Anything else? Mr. Pomeroy, thank you very much. Very good. Thank you, Judge. Mr. Millman. Could you, could you, uh, start with Judge Van Aske's last question? That's exactly where I was going. I was going to start. Judge Van Aske, to answer your question, they're not entitled to a credit for $170,000. You're mixing apples with oranges if you do that. One is medical benefits. The other is underinsured motorist benefits. They're governed by very different provisions in the motor vehicle responsibility law, and they're not entitled to the credit, and that's why we're still here. Could, uh, one state's law apply with respect to one form of benefit, and another state's law apply with respect to the other? Again, I don't think we're asking to apply two different state laws. What we're asking to apply is Pennsylvania public policy. Pennsylvania public policy would allow the recovery of medical benefits well in excess of $175,000. It's not like we couldn't purchase that here in Pennsylvania. You could purchase it, but the default provision is $5,000. But they weren't given that opportunity, Judge. They were. They didn't register their car. Well, but that's not what the law says. They don't, respectfully, the law says that they don't have to register their car. The law says you look to where the insured risk is. All parties are aware of where the insured risk is at the time, by the, two months before the accident. All parties are aware. And the comment, the comment to section 193, if we're applying a true conflicts of laws analysis, comment B says that the location of the insured risk, quote, is given greater than any other single contact. That's the overriding factor to be considered here, Your Honor. And when you couple that with, you know, Pennsylvania beneficiaries to be paid benefits under the policy, when you couple that with the, the other authorities that are provided, I respectfully suggest that the application of the law to the facts here was incorrect. If you apply, if you take the magistrate judge's rationale, the majority of the time it was a New Jersey policy, but then it transferred over to Pennsylvania. That doesn't make sense. What if the photos had moved in April instead of August, then the majority of the time would have been in Pennsylvania and the same facts occurred. Would there have been a change in the magistrate judge's decision? According to his rationale? Yes. Should there be? No, I respectfully submit that if you look to the law of this case and you look to the contacts and you look to where the insured risk is, everybody knows it's in Pennsylvania. And I know my time is up and I won't take too much more of the court's time, but in leaving, I'd like to respectfully suggest that in answer to judge Ambrose, first question to Mr. Pomeroy, there was another reason that they wrote that letter in April. And that was, they knew they were in the ringer. I deposed the adjuster to handle the claim. He said he denied the claim simply because the contract was written in New Jersey. He didn't consider any other factor at all other than it's a New Jersey policy. Did we enact it? Did we issue it properly in Jersey? Yeah, that's it. They didn't consider the contracts, even though we alerted them to, I respectfully suggest to this panel that the real reason that that letter was issued was to, in an attempt to ameliorate the bad faith that had already been perpetrated. That's good. Any other questions? Good. Thank counsel. Thank you very much, your honor. And we're, we'd like to have a transcript made of the oral argument. We would ask both parties to share in the costs. Yes, sir. And please check with the clerk's office before you leave. Thank you very much. Thank you. Thank you. You want to go ahead? Yeah, go ahead. It's up to you, Tony. No.